**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **K.C.**, a child, by her parents and next friends, **CHARLES AND HEATHER C.**, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **LAPORTE COMMUNITY SCHOOL CORPORATION,** **SOUTH LAPORTE COUNTY SPECIAL EDUCATION COOPERATIVE,** **PAULA NICHOLS,** Director of South LaPorte County Special Education Cooperative, in her individual capacity, **REBECCA JEFFERS**, Supervisor of South LaPorte County Special Education Cooperative, in her individual capacity, **MARCIA ALEXANDER**, Principal, in her individual capacity, **JENNIFER OBERLE**, Teacher, in her individual capacity, **TERESA VINSON** and **KATRINA MAGILL**, Paraprofessionals, in their individual capacities, **NATASHA HENRY**, Administrative Assistant, in her individual capacity, and **TERRY MALSTAFF**, in his individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. |
| Defendants. | ) |

**COMPLAINT**

Plaintiff, K C., by her parents and next friends and through her undersigned

attorneys, respectfully submits her Complaint against LaPorte Community School District (the "District") and the other Defendants named above. In support thereof Plaintiff alleges the following:

## I.    INTRODUCTION

1. This case concerns the intentional abuse of a vulnerable young child at the hands of those responsible for her care and education.

2. The minor Plaintiff ("K.C.") is an 8-year-old girl who has been diagnosed with autism spectrum disorder. Although she is intelligent, artistic, and physically capable, she is mostly nonverbal and unable to effectively communicate her thoughts, emotions, or daily activities to others.

3. K.C. attended the Life Skills classroom for disabled children at Kingsford Heights Elementary School in LaPorte County, Indiana from kindergarten to her 2017-2018 2nd grade year.

4. K.C.'s parents grew suspicious about their daughter's treatment at the school in the fall of 2017 when they noticed troubling changes in her behavior. K.C. began to isolate herself in her room and cry unconsolably after arriving home from school, and she began to have nightmares and extreme behavioral meltdowns unlike any her parents had seen before.

5. K.C. also began to refuse to buckle herself into her car seat. Around the same time, her parents noticed bruises and abrasions to her hips, back, and arms.

6. On or about September 21, 2017, K.C.'s father entered the school and discovered K.C. was being forced to sit in a homemade wooden mechanical restraint chair. He

also observed a tan belt on top of the desk next to K.C.'s, long enough to stretch around her and the restraint chair.

7. Defendants Oberle, Vinson and Magill regularly seized K.C. and forcibly confined her in the restraint chair, including with a belt, for extended periods of time over a period of at least five days. She sustained physical harm and psychological trauma from the restraint and confinement.

8. K.C.'s restraint and confinement were not simply the actions of rogue employees. Rather, the administration of the school—whose office was directly across from K.C.'s classroom—approved of the abuse and took an active role in its furtherance by permitting the chair to be brought into the classroom and used.

9. The District never informed K.C.'s parents that a mechanical restraint chair had been specially constructed for use on K.C. Nor did the District inform them that it was using the chair on her. To the contrary, the District actively conspired to conceal its use of the restraint chair by preventing her father, who typically escorted her to the classroom, from entering the classroom after the restraint chair was implemented.

10. The use of mechanical restraint in schools is expressly prohibited by Indiana law. It serves no legitimate educational purpose and has been shown to be traumatize victims and increase problem behaviors. Even inpatient psychiatric hospitals and juvenile detention facilities are prohibited from using restraint unless there is a serious threat of violence or injury.

11. The Defendants' use of restraint and confinement violated state and federal law and the United States Constitution, and the District's own policies.

12. K.C. continues to suffer the results of the restraint and confinement she was subjected to by Defendants.

13. This is an action for damages and other relief arising under the United States Constitution and the laws of the United States and the State of Indiana.

## II. JURISDICTION AND VENUE

14. Jurisdiction over Plaintiff's federal law claims is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (federal civil rights jurisdiction). Plaintiff's claims for violation of her civil rights are brought pursuant to 42 U.S.C. § 1983. Jurisdiction over supplemental state law claims is pursuant to 28 U.S.C. § 1367(a). Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. § 1988, 42 U.S.C. § 12133, and by IC 34-24-3-1.

15. Venue is proper in the Northern District of Indiana pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Indiana and all of the parties are residents of the State.

## III. THE PARTIES

16. Plaintiff K.C. is a citizen of the United States and a resident of the State of Indiana. She is an individual with a disability within the meaning of all applicable statutes including Section 504 of the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12131. Plaintiff is a

minor child under the age of 18. Her father and mother, Charles and Heather C., reside with K.C. in LaPorte County, Indiana and assert no independent claims on their own behalf.

17. At the time of the events underlying these causes of action, Plaintiff K.C. was a special education student at Kingsford Heights Elementary School who was entrusted to the care of the LaPorte Community School Corporation (the "District") and the other named Defendants.

18. The District is a political subdivision of the State of Indiana with the responsibility of providing the Plaintiff with full and equal access to a public education in compliance with federal and state law.

19. The District is the governmental body with overall responsibility for the operation of Kingsford Heights Elementary School and the training and supervision of its faculty and staff including Defendants Nichols, Jeffers, Alexander, Oberle, Vinson, Magill, and Henry.

20. The South Laporte County Special Education Cooperative is a special education cooperative with responsibility for providing special education and related services to participating schools and school districts. The Cooperative receives federal funding. The LaPorte Community School District is a member of the South LaPorte County Special Education Cooperative. At all times relevant to this Complaint the Cooperative was jointly responsible with the District for the delivery of special education services to disabled students in the District. It was also jointly responsible for ensuring that all students within the District were

afforded equal access to a public education and ensuring compliance with federal and state law.

21. Defendant Paula Nichols was the Director of the South LaPorte County Special Education Cooperative at all times relevant to this Complaint. At all times relevant to this Complaint she was acting under color of law in her capacity as the Director of Special Education. Her duties included ensuring that all students within the District were afforded equal access to a public education. She was responsible for hiring, supervising, and training staff, carrying out the policies of the District and the State of Indiana's Department of Education, and ensuring compliance with federal and state law. She took a direct role in making decisions regarding the delivery of special education services to K.C..

22. Defendant Rebecca Jeffers was the Supervisor of the South LaPorte County Special Education Cooperative at all times relevant to this Complaint. At all times relevant to this Complaint she was acting under color of law in her capacity as the Supervisor of Special Education. Her duties included ensuring that all students within the District were afforded equal access to a public education. She was responsible for hiring, supervising, and training staff, carrying out the policies of the District and the State of Indiana's Department of Education, and ensuring compliance with federal and state law. She took a direct role in making decisions regarding the delivery of special education services to K.C.

23. Defendant Marcia Alexander was the Principal at Kingsford Heights Elementary School at all times relevant to this Complaint. At all times relevant to this

Complaint she was acting under color of law in her capacity as the Principal of Kingsford Heights Elementary School. Her duties included ensuring that all students within her school were afforded equal access to a public education. She was also responsible for hiring, supervising, and training staff, carrying out the policies of the District and the State of Indiana's Department of Education, and ensuring compliance with federal and state law.

24. Defendant Jennifer Oberle was the lead teacher at Kingsford Heights Elementary School's Life Skills classroom at all times relevant to this Complaint. At all times relevant to this Complaint she was acting under color of law in her capacity as a teacher at Kingsford Heights Elementary School. Her duties included providing the structure, consistency, and behavioral supports that would enable children with significant intellectual disabilities and behavioral challenges equal access to the services, programs, and activities of the District. She was also responsible for training and supervising the paraprofessionals who worked with children in the Life Skills classroom.

25. Defendants Teresa Vinson and Katrina Magill (collectively "Defendant Paraprofessionals") were paraprofessionals in the Life Skills classroom at all times relevant to this complaint.  At all times relevant to this Complaint they were acting under color of law in their capacity as paraprofessionals at Kingsford Heights Elementary School. Their duties included assisting the lead teacher in performing her job duties and ensuring that the children were provided with equal access to the services, programs, and activities of the District.

26. Defendant Natasha Henry was an Administrative Assistant at Kingsford Heights Elementary School at all times relevant to this Complaint. At all times relevant to this Complaint she was acting under color of law in her capacity as an Administrative Assistant at Kingsford Heights Elementary School. Her duties included controlling entry to the School through operation of the School's automated keyless entry system.

27. Defendant Terry Malstaff constructed the mechanical restraint chair that is the subject of this litigation. In so doing, he acted under color of law.

28. Each Defendant is responsible in some manner for the custom, policies, and/or practices alleged herein and/or is a necessary party for obtaining appropriate relief. In performing each of the acts alleged in this Complaint and in omitting to do those acts that are alleged in this Complaint to have been legally required, each Defendant acted as an agent for each and all other Defendants. The injuries inflicted upon Plaintiff occurred because of the actions and omissions of each and all of the Defendants.

## IV. FACTUAL ALLEGATIONS

## A. THE USE OF MECHANICAL RESTRAINTS IS PROHIBITED IN INDIANA

29. The use of mechanical restraint as a punishment or to enforce compliance has been found to be so extremely detrimental to the mental and physical health of children that it has been prohibited by every level of state and federal government having any authority over special education, including the State of Indiana and the Indiana Department of Education.

30. Every professional organization in the field has also issued statements against the use of restraints for punitive or educational purposes, including the Council for Exceptional Children, Substance Abuse and Mental Health Services Administration, National Association of State Mental Health Program Directors, American Psychiatric Society, Autism Society of America, Association for Persons with Severe Disabilities, and Child Welfare League of America.

31. The use of restraint is so inherently dangerous that inpatient psychiatric hospitals are prohibited from using restraint unless there is a "serious threat of violence or injury." 42 C.F.R. § 483.356. When restraint is used in that setting, the hospital must inform the child's parent "as soon as possible" after the intervention. 42 C.F.R. § 483.366.

32. There is no research showing restraint to be an effective method of behavior modification. Rather, research has shown that the known consequences of repeated use of restraints include: 1) harm due to the reduction of social and developmental opportunities and the increased resistance of the victim; 2) increased risk of physical abuse and injury; and 3) psychological trauma to the victim.

33. In 2013, Indiana's legislature established the Commission on Seclusion and Restraint in Schools (the "Commission") and tasked it with two duties. First, it was required to adopt rules concerning the use of restraint and seclusion in public schools "with an emphasis on eliminating or minimizing" their use. Second, it was

to "develop, maintain, and revise a model restraint and seclusion plan for schools."

34. The law also required all school districts in Indiana to "adopt a restraint and seclusion plan that incorporates, at a minimum, the elements of the model plan" developed by the Commission. Thus, the law required the Commission to create a "floor" of permissible restraint and seclusion practices, and in turn required schools to incorporate those practices into their own plans.

35. The Commission's rules (the "Rules") became effective on or about August 5, 2014, when they were entered into Indiana's Administrative Code at 513 IAC 1-1 *et seq.* The Commission's Model Seclusion and Restraint Plan became effective on or about July 9, 2015 and remained in place at all times relevant to this litigation.

36. The Commission included a statement of its principles in the Rules. These included "[e]very effort should be made to prevent the need for the use of restraint and for the use of seclusion" and "any behavioral intervention must be consistent with the student's rights to be treated with dignity and to be free from abuse" and "[p]hysical restraint or seclusion should not be used except in situations where the student's behavior poses imminent risk of injury to self or others."

37. The Commission expressly prohibited the use of mechanical restraints. The rule states "the use of mechanical restraints to restrict a student's freedom of movement is prohibited." It defined a mechanical restraint as follows:

> "Mechanical restraint" means the use of:
> (1) a mechanical device;
> (2) a material; or

10

(3) equipment;

attached or adjacent to a student's body that the student
cannot remove and that restricts the freedom of movement of
all or part of the student's body or restricts normal access to
the student's body.

38. The Commission also required schools to document all instances of the use of
restraint and provide an incident report to the student's parent "as soon as
possible" after the incident.

39. The District adopted its own "LPCSC Seclusion and Restraint Plan" on or about
December 11, 2014 (the "District's Restraint Plan") and it was in effect at all times
relevant to this litigation.

40. The District's Restraint Plan did not include, and on information and belief
continues not to include, elements required by the Commission. The missing
elements include (1) the statement that any "behavioral intervention must be
consistent with a child's rights to be treated with dignity
and respect, and to be free from abuse" and (2) the statement that "any behavior
intervention used must be consistent with the student's most current
individualized education program and with the student's behavioral intervention
plan."

41. The District's Restraint Plan did provide that "[m]echanical or chemical restraints
are not authorized in school" (emphasis in original).

**B. THE MINOR PLAINTIFF, K.C.**

42. K.C. is an 8-year-old girl who has been diagnosed with autism spectrum disorder
and attention deficit hyperactivity disorder ("ADHD").

43. Autism is a developmental disorder characterized by impairments to communication and social interaction. Autism is known as a "spectrum" disorder because there is wide variation in the type and severity of symptoms that people experience.

44. People with autism have difficulty communicating and interacting with other people, and they exhibit restricted interests and repetitive behaviors. A typical individual with autism will make little or inconsistent eye contact, will tend not to engage with or listen to people, will rarely share their enjoyment of activities with others, and will have difficulty maintaining back and forth conversation. They may also repeat certain words or phrases, have a lasting and exclusive interest in certain items or activities, and get upset by slight changes in routine. Autistic individuals are also likely to be overly sensitive to sensory inputs such as light, noise, clothing, or temperature.

45. Although some individuals with autism also have impaired intellectual functioning—the ability to learn, reason, solve problems and so on—many autistic individuals are incredibly intelligent and able to live independently. Temple Grandin, for example, is a famous autism advocate and professor of animal science at Colorado State University who suffers from autism.

46. K.C. suffers from many typical autism symptoms. She fixates on and often repeats dialogue from her favorite movies. She has difficulty adjusting to changes in her daily routines and is sensitive to sensory inputs. She rarely engages in mutual conversation or play, and she is not aware of how her behavior affects others or

causes negative reactions. She also has an innate need to move around, consistent with her diagnosis of ADHD.

47. K.C. also has many positive qualities. She is intelligent and displays savant skills in art and sculpting far beyond her age and level of training. She is adept at operating electronic devices and has learned Spanish and sign language using an Ipad. Her fine motor skills are normal and she loves to play outside like any other 8-year-old child.

48. K.C. does not have any orthopedic impairments or physical limitations that prevent her from independently sitting in a non-modified school desk. No physician or mental health care professional has ever recommended the use of restraint on K.C.

49. K.C. currently attends a private school.

## C. K.C.'S SCHOOLING PRIOR TO HER 2ND GRADE YEAR

50. K.C. has attended the LaPorte Community School District since 2013, when she was three years old and enrolled in the District's special education preschool.

51. The District has recognized K.C. as having a disability since her preschool year. She has had an Individualized Education Program ("IEP") outlining her program of special education since 2013.

52.  K.C. enrolled in kindergarten at Kingsford Heights Elementary School in the fall of the 2015-2016 school year. She was placed in the Life Skills classroom. The Life Skills program is designed to address "functional academics, social skills, and life skills" for disabled children. Federal education law defines the Life Skills

classroom as a "separate class" meaning that the students in that class are all disabled and separated from their non-disabled, general education peers.

53. K.C. attended the Life Skills classroom for her kindergarten, 1st grade, and 2nd grade years. Defendant Oberle served as K.C.'s lead teacher in the Life Skills classroom for all of those years.

54. Several events happened during K.C.'s kindergarten and 1st grade years that concerned her parents. On January 5, 2016, she came home from school with a scratch and bruise to the side of her neck. Her parents did not receive a written incident report regarding this injury, so her father asked the School what happened. Defendant Henry explained she accidentally scratched K.C.

55. On April 13, 2017, K.C. came home from school wearing no shoes, no socks, and no coat. When her mother asked the bus driver what happened, she explained that K.C. had entered the bus after school without those clothes.

56. On May 9, 2017, K.C. came home with a bruise to her cheekbone and elbow. No written incident report was provided, but Defendant Oberle phoned K.C.'s parents and explained that she fell into the corner of a desk.

57. The School and K.C.'s parents met on January 25, 2017 to develop an IEP for her upcoming 2nd grade year. The IEP developed as a result of that meeting—like all of K.C.'s prior IEPs and behavior plans—did not provide for the use of a restraint chair.

### D. PARENTS' DISCOVERY OF THE RESTRAINT CHAIR

58. K.C. entered Kingsford Heights Elementary School (the "School") for her 2nd grade year in the fall of the 2017-2018 school year.

59. K.C.'s parents began to grow suspicious of their child's care at Kingsford Heights soon after the fall semester began, when she began to exhibit new and troubling behaviors. She began to arrive home from school with shirts that were soaked in saliva from her chewing on them. She refused to get dressed to go to school, and once dressed for school, she would remove her clothes. She refused to keep her seat belt on in her parents' car, refused to talk, refused to play on the iPad, and expressed limited desire to draw or create artwork. K.C. also began having nightmares and extreme meltdowns unlike any her parents had seen before.

60. These new behaviors were also recognized by K.C.'s in-home behavior therapist, who noted them in her progress notes.

61. Her parents also began to notice bruises and abrasions to her hips, back, and arms, which they photographed on certain instances.

62. On September 5, 2017, K.C. came home from school with dirt on her face, hands, and elbows. Her pants, which were new, had abrasions to the front thigh area on each leg and were also dirty. Her parents did not receive an explanation for her condition or the abrasions to her pants.

63. On September 6, 2017, K.C. came home from school and began to cry unconsolably in her mother's arms. Due to her autism, K.C. could not communicate to her mother the reason for her distress.

15

64. Around this same time, the School began preventing K.C.'s father from escorting her to the classroom each morning as he had done in the past. This was achieved through operation of the School's automated keyless entry system.

65. The entrance to Kingsford Heights school consists of one set of outer doors leading to a waiting/administrative area, and another set of doors leading to the classrooms. Whenever K.C. and her father would arrive, Defendant Henry, who controlled all exit and entry to the building from her desk in the waiting/administrative area, would not buzz K.C. and her father in until Defendant Oberle arrived at the second set of doors. Once Defendant Oberle arrived, Defendant Henry would unlock the door and Defendant Oberle would meet K.C. and her father in the waiting room and escort K.C., without her father, to class. The School did not apply this entry procedure to other parents.

66. On or about September 21, 2017, K.C.'s father came to the School and after a reciprocal "good morning" between him and a school employee, he walked to the Life Skills classroom.

67. Upon entering the classroom K.C.'s father was shocked to observe a homemade wooden restraint desk with his daughter's name on it. The classroom contained one additional restraint desk that appeared to be similarly constructed, which was placed next to K.C.'s desk.

68. He also observed a tan belt sitting on top of the similarly-constructed desk. The belt was long enough to stretch around K.C. and the restraint desk.

16

69. The desk had wooden partitions on the bottom, right side, and front. The wood was construction-grade plywood, and although felt had been glued on to the outside faces of the panels, the inside of the panels was not covered in felt and was very rough to the touch.

70. On information and belief, a belt was used to prevent K.C. from exiting the mechanical restraint desk and her trauma and fear of being seat-belted stem directly from the School's use of a belt to restrain her.

71. The mechanical restraint desk was not used to discipline K.C. or as an instrument of corporal punishment.  Nor was the desk used as a legitimate instructional tool, as no reasonable educator would employ restraint except to prevent imminent injury. The use of restraint and confinement here was motivated by malice and was done with callous and deliberate indifference towards the harm it was causing K.C..

72. The use of the desk was approved by the District's occupational therapist and physical therapist, and by Defendants Alexander, Oberle, Jeffers, Vinson and Magill.

73. At no point did any of the Defendants provide K.C.'s parents with an incident report detailing the use of restraint, as required by the District's Restraint Plan and Indiana law.

74. K.C.'s parents refused to return her to the School after they discovered the restraint desk. She has not attended the School since the day it was discovered.

17

75. After the restraint desk was discovered, K.C.'s parents asked the School to hold an emergency meeting. A meeting between her parents and School staff, including Defendants Oberle, Jeffers, Nichols, and Alexander was held at the School on or about September 29, 2017.

76. At the meeting, K.C.'s father asked why he and his spouse were not told about the restraint desk. Defendant Nichols stated that she had spoken with the District's attorney and "they had not done anything wrong." She also stated that Defendant Oberle's father, now recognized as Defendant Malstaff, had constructed the desk.

## E. THE HARM TO K.C.

77. The use of restraint on K.C. served no legitimate educational purpose and provided her with no benefit whatsoever. To the contrary, the restraint desk humiliated K.C., increased her problem behavior, and traumatized her.

78. The School's use of restraint destroyed the trust that K.C. placed in her caretakers. The ability to trust others is incredibly important for K.C. because she relies on, and will continue to rely on, others for therapies designed to help her to become an independent adult.

79. Thus, Defendants' illegal use of restraint and confinement on K.C. has caused her to have a significantly increased risk of isolation from general society and puts her at significantly higher risk of institutionalization in the future.

80. The use of restraints has also resulted in K.C.'s problem behaviors becoming more resistant to effective intervention in the future, thus causing her serious permanent

damage, reducing her employability as an adult, and necessitating further psychological intervention now and in the future.

### V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### VIOLATION OF FOURTH AMENDMENT CONSTITUTIONAL GUARANTEE AGAINST UNLAWFUL SEIZURE (42 U.S.C. § 1983)

81. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

82. Plaintiff has a Constitutional right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure.

83. Plaintiff has a constitutionally protected right to be secure in her person and to maintain her bodily integrity against unreasonable assaults of her person.

84. Defendants, in physically seizing and confining Plaintiff, unlawfully subjected Plaintiff to excessive, unreasonable, and unnecessary physical force and thereby caused physical harm and serious and long-term psychological harm.

85. Physically restraining and strapping K.C. in the mechanical restraint desk was an unreasonable and unlawful seizure of Plaintiff by Defendants acting under color of law.

86. Defendants knew or should have known that state law forbade the use of mechanical restraints for instruction. Defendants nonetheless continued these customs, policies, and/or practices.

87. Defendants knew or should have known that all relevant research has shown the use of restraints to be dehumanizing, humiliating, and physically dangerous.

19

88. Defendants' actions were motivated by an intent to harm Plaintiff, or by deliberate indifference to the harm they were causing to Plaintiff.

89. The LaPorte Community School District and the South LaPorte County Special Education Cooperative had a policy, custom, or practice of failing to adequately train and supervise its faculty and staff in the use of mechanical restraints. They also approved the use of the mechanical restraint here. This failure to train and supervise, and the resulting approval of mechanical restraint, violated Plaintiff's constitutional rights.

90. The LaPorte Community School District's and the Cooperative's policies, customs, or practices, as described herein, were the legal and proximate cause of Plaintiff's injuries.

91. The acts or omissions of each Defendant caused Plaintiff's damages in that she suffered physical and mental pain during the incidents and continues to suffer from ongoing and continuous psychological injury and will suffer from psychological injury in the future.

92. Defendants' actions, as described above, were objectively unreasonable, willful and wanton, in light of the facts and circumstances confronting Defendants.

93. The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment and under color of law.

94. The conduct of the individual Defendants violated the clearly established rights of Plaintiff of which reasonable people in Defendants' position knew or should have known.

95. The actions of all Defendants intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION:
## CONSPIRACY TO DEPRIVE PLAINTIFF OF CIVIL RIGHTS (42 U.S.C. § 1983)

96. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

97. Plaintiff has a constitutional under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, a constitutional right to procedural due process and equal protection under the laws, and the right to be free from discrimination under federal law.

98. The Defendants conspired to deprive the plaintiff of these rights through a coordinated set of actions they intentionally shielded from K.C.'s parents.

99. The conspiracy began when Defendant Oberle employed Defendant Malstaff to construct the restraint desk. Defendant Oberle delegated her authority as a schoolteacher to make decisions regarding her student's bodily liberty to Defendant Malstaff. As a result, Defendant Malstaff's actions were taken under color of law.

100. After the desk was constructed, it was brought into Kingsford Heights Elementary School. The restraint desk could not have been brought into the school nor used

without the knowledge of Defendant Alexander, whose office was located mere feet away from the Life Skills classroom.

101. Defendants Magill and Vinson similarly knew about the use of the desk, as they were employed in the Life Skills classroom for the duration of its use.

102. Defendant Henry acted to prevent K.C.'s parents from discovering the use of the desk through control of the School's automated keyless entry system.

103. The actions of the Defendants were coordinated and purposefully taken to prevent K.C.'s parents from discovering the restraint desk, and to deprive K.C. of her rights.

104. The conduct of the Defendants violated the clearly established rights of Plaintiff of which reasonable people in Defendants' position knew or should have known.

105. Defendants' actions, as described above, were objectively unreasonable, willful and wanton, in light of the facts and circumstances confronting Defendants.

106. The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment and under color of law.

107. The actions of all Defendants, as described herein, intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and federal antidiscrimination law and caused her other damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION:**
**DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS 42 U.S.C. § 1983)**

108. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

109.     Plaintiff has a procedural due process right to be free of deprivations of liberty and assaults on her bodily integrity without due process of law.

110.     This right requires the LaPorte Community School District to provide process to Plaintiff before unilaterally instituting a physically forceful policy and confining Plaintiff in a mechanical restraint. The District's practice deprived Plaintiff of her right to be free from unlawful deprivations of her liberty and bodily integrity without due process of law.

111.     It is clearly established that public school students, and particularly students with disabilities, have a constitutionally protected right to be free from punitive and malicious physical abuse from school employees. This abuse is an unlawful violation of Plaintiff's constitutionally protected right to liberty.

112.     The use of mechanical restraint and confinement was a malicious action taken against Plaintiff without regard to her individual educational program or behavior intervention plan, the District's restraint policy, and Indiana state law on restraint and confinement.

113.     The LaPorte Community School District's practice of regularly restraining and confining Plaintiff when she was not posing any danger to herself or others violated Plaintiff's liberty interest.

114.     Plaintiff's parents never consented to the District's use of a restraint desk. Defendants never explained or documented their use of the restraint desk. Instead, Defendants deliberately misled and failed to disclose to Plaintiff's

parents the regular and abusive use of mechanical restraints on K.C. This failure to provide notice or process was in violation of Plaintiff's constitutional right to due process.

115. Defendants were required to provide notice to Plaintiff's parents regarding the use of restraints on K.C..

116. The LaPorte Community School District did not provide any process at all before violating the clearly established rights of K to be free from abuse, deprivations of liberty, and violation of her bodily integrity.

117. The District's policies, customs, and/or practices, as described herein, were the legal and proximate cause of Plaintiff's injuries.

118. The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

119. The acts and/or omissions of each Defendant caused Plaintiff's damages in that she suffered physical and mental pain and continues to suffer from the resulting ongoing and continuous psychological injury as well as future damages alleged herein.

120. The actions of all Defendants, as described herein, intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION (42 U.S.C. § 1983)**

121.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

122.    By their actions, as described herein, Defendants, under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiff to the deprivation of the rights, privileges, or immunities secured by the Constitution and law.

123.    Defendants discriminated against the Plaintiff, in whole or in part, because of her status as a child with a disability, denying her equal protection under the law as required under the Fourteenth Amendment to the U.S. Constitution.

124.    Plaintiff was mechanically restrained based, in whole or in part, on her disabilities or manifestations of her disabilities.

125.    Students without disabilities were not subjected to the abuses the Plaintiff was subjected to. This difference in treatment was due, in whole or part, to Plaintiff's status as a student with disabilities. Mechanical restraint chairs were not used as threats to elicit desired behavior from non-disabled students. Mechanical restraints were not used, either for instructional or punitive purposes, on students without disabilities. This abusive and illegal treatment was reserved solely for children with disabilities within one classroom within the District.

126.     The Defendants' decision to treat Plaintiff worse than the rest of the student population is unconstitutional.

127.     There is no rational basis for the District's policy relating to mechanical restraint of children with disabilities, including Plaintiff. This policy shocks the conscience and cannot be justified as relating to any rational basis.

128.     The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

129.     The actions of all Defendants, as described herein, intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages in amounts to be ascertained at trial.

## FIFTH CAUSE OF ACTION:
## FAILURE TO TRAIN AND SUPERVISE (42 U.S.C. § 1983)

130.     Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

131.     The LaPorte Community School District, the Cooperative, Defendant Nichols, Defendant Jeffers, and Defendant Alexander all served in supervisory roles with respect to those individuals responsible for the delivery of education to the Plaintiff.

132.     The Defendants failed to adequately train and supervise teachers, paraprofessionals, and other personnel. They failed to train the staff at Kingsford Heights Elementary School, including those in the Life Skills

classroom, on the State of Indiana's rules regarding restraint and seclusion and the District's own policy on restraint and seclusion.

133.   As a result of the Defendants' failures, Defendants regularly restrained and confined Plaintiff in the mechanical restraint chair for extended periods of time in direct violation of state law and the District's own policy, and in violation of her constitutional rights.

134.   Had the Defendants made reasonable effort to properly train and supervise school staff, Plaintiff would not likely have suffered the restraint and confinement by Defendants, nor would Plaintiff have likely sustained the damages that she has sustained and will sustain in the future.

135.   The Defendants' failure to properly train and supervise the subordinate employees was the moving force and proximate cause of the violation of Plaintiff's constitutional rights as described herein.

136.   The acts and omissions of the Defendants were conducted within the scope of their official duties and employment and under color of law.

137.   The omissions of the Defendants caused Plaintiff's damages in that she suffered physical and mental pain during the abuse that she endured and the lasting damage that she will endure in the future.

138.   The actions Defendant, as described herein, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other lasting damages in an amount to be ascertained according to proof at trial.

**SIXTH CAUSE OF ACTION:**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**(29 U.S.C. §§ 794 et seq.)**

139.     Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

140.     Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504"), and the regulations promulgated thereunder, 34 C.F.R. Part 104, prohibit discrimination against persons with disabilities. K.C. has multiple disabilities as alleged previously and is a protected person under Section 504.

141.     Section 504 prohibits the exclusion from the participation in, or being denied the benefits of, or being subjected to discrimination under, any program or activity receiving federal financial assistance. Congressional authority to condition federal funding under this Act is derived from the enumerated powers contained in Article 1, Section 8 of the U.S. Constitution.

142.     The LaPorte Community School District and the South Laporte County Special Education Cooperative are both recipients of federal financial assistance.

143.     The practices described above, including but not limited to restraining Plaintiff in a mechanical restraint chair, were discriminatory and denied Plaintiff the benefits of participation in a public school education.

144.    Students without disabilities were not subjected to the abuses the Plaintiff was subjected to, as described herein. This difference in treatment was due, in whole or part, to Plaintiff's status as a student with disabilities. Mechanical restraint chairs were not used as threats to elicit desired behavior from non-disabled students. Mechanical restraints were not used, either for instructional or punitive purposes, on students without disabilities. This abusive and illegal treatment was reserved solely for children with disabilities, and only in Kingsford Heights Elementary School's Life Skills classroom.

145.    Defendants have violated Plaintiff's rights under Section 504 and the regulations promulgated thereunder by denying Plaintiff the benefits of receiving full and equal access to the public education programs and activities offered within the LaPorte Community School District.

146.    Defendant's practices were intentionally discriminatory and were taken with deliberate indifference to the strong likelihood that the practices would result in a violation of Plaintiff's federally protected rights.

147.    As a direct and proximate result of Defendant's violation of Section 504, Plaintiff has suffered, continues to suffer, and will suffer in the future injuries to her person including, but not limited to, pain, humiliation, anxiety, mental anguish, emotional distress, decreased employability, and damage to her personal relations in amounts to be ascertained according to proof at trial.

## SEVENTH CAUSE OF ACTION:
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. §§ 12131 et seq.)

148.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if
fully set forth herein.

149.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 et
seq. and the regulations thereunder, 28 C.F.R. Part 35, governing state and
local governmental entities, protects persons from discrimination on the
basis of disability by public entities. K.C. has multiple disabilities as
alleged previously and is a protected person under the ADA.

150.     The ADA prohibits the exclusion from participation in, or being denied the
benefits of the services, programs, or activities of the public entity, or being
subjected to discrimination by such entity on the basis of disability.

151.     The discriminatory practices described herein excluded Plaintiff from
participating in and receiving the benefits of a public school education.

152.     The Defendant's practices were intentionally discriminatory and exhibited
a deliberate indifference to the strong likelihood that the pursuit of these
practices would result in a violation of Plaintiff's federally protected rights.

153.     The Defendants violated Plaintiff's rights under the ADA and the
regulations promulgated thereunder, denying Plaintiff the benefits of the
services, programs, and activities to which she was otherwise entitled from
the LaPorte Community School District. Plaintiff was mistreated in

violation of law as a direct result of her disabilities and the manifestations of these disabilities.

154.     Students without disabilities were not subjected to the abuses the Plaintiff was subjected to, as described herein. This difference in treatment was due, in whole or part, to Plaintiff's status as a student with disabilities. Mechanical restraint chairs were not used as threats to elicit desired behavior from non-disabled students. Mechanical restraints were not used, either for instructional or punitive purposes, on students without disabilities. This abusive and illegal treatment was reserved solely for children with disabilities.

155.     As a direct and proximate result of Defendants' violation of the ADA, Plaintiff has suffered and continues to suffer injuries to her person, including, but not limited to, pain, humiliation, anxiety, mental anguish, emotional distress, decreased employability, and damage to her personal relations in amounts to be ascertained according to proof at trial.

**EIGHTH CAUSE OF ACTION:**
**STATE LAW CLAIM FOR RELIEF PURSUANT TO THE INDIANA CRIME VICTIM'S RELIEF ACT AS TO DEFENDANTS ALEXANDER, OBERLE, VINSON, AND MAGILL IN THEIR INDIVIDUAL CAPACITIES (I.C. 34-24-3 et seq.)**

156.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

157.     The Indiana Crime Victim's Relief Act allows a civil action to be brought against a person who knowingly or intentionally confines another person without the other person's consent.

158.     Indiana's criminal code provides that "confine" means to "substantially interfere with the liberty of a person." I.C. 35-42-3-1.

159.     The restraint practices as described herein constituted criminal confinement.

160.     As a direct and proximate result of the confinement, Plaintiff has suffered a pecuniary loss and is entitled to all relief available under the Indiana Crime Victim's Relief Act, including an amount not to exceed three times the amount of Plaintiff's actual damages, the costs of this action, and reasonable attorney's fees.

**NINTH CAUSE OF ACTION:**
**STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO DEFENDANTS ALEXANDER, OBERLE, VINSON, AND MAGILL IN THEIR INDIVIDUAL CAPACITIES**

161.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

162.     The restraint practices as described herein were abusive to the Plaintiff, served no legitimate purpose, were illegal under federal and state law, and are not condoned by any professional in the field of education. As a result, they constituted extreme and outrageous conduct that no reasonable person in a civilized society would engage in.

32

163.      The restraint practices were intentionally undertaken by the Defendants Alexander, Oberle, Vinson, and Magill.

164.      As a direct and proximate result of the Defendants' outrageous conduct., K.C. suffered and continues to suffer direct and severe emotional distress in amounts to be ascertained according to proof at trial.

## JURY DEMAND

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Compensatory damages to Plaintiff for injury, emotional distress, and medical expenses;

2.      Punitive damages;

3.      Attorney's fees and costs; and

4.      Such other relief as the court deems just and proper.

Respectfully submitted,

_____
Corbin R. Fowler (#30620-15)
Pamela R. Cleary (#22929-53)
Attorneys for Plaintiff
CLEARY/FOWLER LAW OFFICE
605 S. Lake Street
Gary, IN 46403
(219) 369-4900